**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| STEEL DUST RECYCLING, LLC, DRA, INC., AND ZINC INTERNACIONAL, S.A. | § § § | |
| *Plaintiffs/Counter-Defendants,* | § § | |
| vs. | § § | CIVIL ACTION NO. 4:19-cv-2818 |
| RUSS ROBINSON AND ZINC RESOURCES, LLC | § § | |
| *Defendants/Counter-Plaintiffs,* | § § | |
| vs. | § § | |
| ZINC NACIONAL S.A. | § § | |
| *Counter-Defendant.* | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON SOLICITATION,
<u>TORTIOUS INTERFERENCE, AND TRADE SECRETS CLAIMS</u>**

Defendants Russ Robinson, Zinc Resources, LLC, US SDR, LLC, Zinc Resources Holding, LLC, U.S. Global Steel Dust, Inc., Thomas Knepper, and Robert Sherry (collectively, "Defendants") move for summary judgment on the claims related to solicitation and/or tortious interference with Plaintiffs' existing contracts and prospective contracts. Defendants also move for summary judgment on Plaintiffs' trade secrets claims.

Insofar as Plaintiffs' breach of contract claim against Defendant Russ Robinson is based on the nonsolicitation clause in the 2009 Noncompete, that provision was not incorporated by modification into the 2014 Noncompete. Even if it was, the nonsolicitation clause is a restraint of trade that is unenforceable as modified by the 2014 Noncompete. And regardless of the enforceability of that provision, Defendants did not breach that provision in procuring a contract with Steel Dynamics Southwest, LLC ("SDI Sinton") or in negotiating and discussing steel dust recycling contracts with other steel mills.

Plaintiffs' tortious interference with ***prospective relationships*** claim fails because the undisputed evidence shows Plaintiffs cannot prove they would have obtained the SDI Sinton contract. As for tortious interference with ***existing contracts***, there is no evidence any counterparty breached a contract with Plaintiffs (let alone that Defendants induced any such breach).

And finally, Plaintiffs' trade secret claims preempt their common law claims and fail as matter of law because the alleged trade secrets lack independent value and Defendants did not use any alleged trade secrets.

For these reasons, Defendants respectfully ask the Court to grant summary judgment in their favor on Plaintiffs' breach of contract claim based on solicitation (Claim A), tortious interference (Claims J & K), and trade secrets claims (Claims L &M).

## **BACKGROUND FACTS**

1

Russ Robinson founded Steel Dust Recycling, LLC ("SDR") and US SDR, LLC ("USSDR"). SDR was formed for the purpose of recycling steel dust from steel manufacturers. SDR built a steel dust recycling facility in Millport, Alabama which started operating in 2008. USSDR was the holding company and majority interest holder in SDR.

In September 2009, Plaintiff DRA, Inc. and Zinc Nacional ("ZN") purchased the outstanding membership interests in SDR from USSDR. The purchase was documented in a Membership Interest Purchase Agreement ("MIPA"). Ex. 2, MIPA. At the time of the sale, SDR conducted business in Alabama and had contracts to receive dust from steel dust suppliers that were located in Alabama, Mississippi, Tennessee, Texas, Georgia, Florida. *Id.* § 3.13 at 26. The disclosure schedule from the MIPA lists all of the recycling contracts SDR had at the time of the sale. *Id.* The contracts were to service these mills at the following locations: (1) SMI Steel, Inc. in Birmingham, Alabama; (2) Gerdau Ameristeel US Inc. in Jacksonville and Tampa, Florida, Georgia, and various locations in Tennessee; (3) Consolidated Environmental Management in Jackson, Mississippi, Jewett, Texas, Birmingham and Decatur, Alabama, and Memphis, Tennessee; (4) SeverCorr LLC in Columbus, Mississippi; and (5) SSAB Alabama, Inc. in Axil, Alabama. *See id.*; *see also* Exs. 3 to 7.

In addition to selling SDR and the Millport facility, Robinson entered into an employment agreement with SDR for a seven-year term (Employment Agreement). Ex. 8, Employment Agreement. The Employment Agreement contained a seven-year noncompete provision that ran concurrent with the term of employment. *Id.* ¶ 10.2. The Employment Agreement also contained a nonsolicitation clause (Nonsolicitation Clause), which stated "that during the Covenant Period, [Robinson] will not solicit, persuade, interfere with, induce, encourage or endeavor to entice away from [SDR], for the benefit of any Competitor located within the Restricted Territory, any of

[SDR's] suppliers, distributors, licensees or other persons with whom [SDR] *has a contractual relationship.*" *Id.* ¶ 10.3 (emphasis added). The "Restricted Territory" is defined as Mexico, the continental United States, and the Canadian provinces of British Columbia, Alberta, Saskatchewan, Manitoba, and Ontario. *Id.* at ¶ 10.2.

After the sale in 2009, and despite the employment agreement, Robinson did not perform any work for SDR. Ex. 9, Robinson Dep. at 23:24–24:8; Ex.10, Alverde Dep. at 12:10–16:4, 17:24–18:24. Robinson provided some transition assistance but was ultimately not directed to conduct any work thereafter. Ex. 10, Alverde Dep. at 20:8–15. Robinson did not assist SDR with the procurement of any new or additional supplier contracts after the sale in 2009.

On July 18, 2014, Robinson, SDR, USSDR, DRA, GSD, and Plaintiff Zinc Internacional ("ZI") entered into a noncompetition agreement (the "2014 Noncompete") related to ZI's investment and agreement to make capital contributions to GSDK, Ltd. to construct a plant in Korea. Ex. 11, 2014 Noncompete. Like the restrictive covenants in the Employment Agreement, the 2014 Noncompete contained a seven-year term. *Id.* at ¶ 3. As a "Covenant Not to Compete," it prohibited Robinson from engaging in "the manufacturing of American Process Zinc Oxide (Direct Process Zinc Oxide) in North America . . . or in South Korea (except through GSDK)" and from directly or indirectly owning, operating, managing, controlling, or participating in the ownership, management, operation or control of any business related principally to EAF dust recycling in the continental United States, Mexico, certain parts of Canada, and South Korea. *Id.* ¶ 3.

The 2014 Noncompete explicitly provides that it is "not an agreement to provide employment to Robinson" and that "this Agreement shall be operative regardless of any termination of Robinson's employment with SDR." *Id.* ¶ 6. It further provided that the 2014 Noncompete was only "intended to and does modify . . . Section 10.2 of the Employment

Agreement," and that if there were any inconsistencies between the Employment Agreement and the 2014 Noncompete, the 2014 Noncompete would control. *Id.* ¶ 7(a).

## ARGUMENT

**A.    The Parties Did Not Intend for the Nonsolicitation Clause to be Read into the 2014 Noncompete by Modification.**

Plaintiffs argue that the 2014 Noncompete modified Robinson's Employment Agreement, such that it created a "new contract" that included the newly modified provisions and the unchanged old provisions of the Employment Agreement. Plaintiffs' position is contrary to the language in the agreements and the parties' intent. To the extent that this issue has been previously reviewed and decided by the Court, Defendants respectfully move for reconsideration of this issue as the facts conclusively show that the parties did *not* intend for the Nonsolicitation Clause to be imported into the 2014 Noncompete via modification, or at the very least, create a genuine dispute for resolution at trial.

"Whether a contract is modified depends on the parties' intentions and is a question of fact." *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228-29 (Tex. 1986). The burden of proving a modification "rests on the party asserting the modification." *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 701 (Tex. App.—Dallas 2008, no pet.). Further, while "it is well settled that a written contract may comprise multiple documents," courts look to whether the separate documents were "executed at the same time, for the same purpose, and in the course of the same transaction . . . ." *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex. 1984); *see also Rieder v. Woods*, 603 S.W.3d 86, 101 (Tex. 2020) ("In certain circumstances, courts may construe multiple documents as if they form a single, unified instrument. But this is not one of those cases. . . . Perhaps most importantly, we are unable to glean from either agreement's express terms that they were executed as part of the same business transaction.").

4

Here, the record reflects that the 2014 Noncompete is a separate, independent agreement unrelated to the Employment Agreement. *See, e.g.*, Doc. 136-1, Robinson Decl., ¶ 8; Ex. 9, Robinson Dep. at 127:1–7; 133:1–10. The two agreements were based on completely separate transactions that occurred at separate times in different parts of the world. The Employment Agreement stemmed from the sale of SDR and a facility in Alabama and was made in conjunction with an offer of continued employment to Robinson. Ex. 8, EA. The 2014 Noncompete, on the other hand, was by its terms *not* an employment agreement and related to ZI's acquisition of part of an interest in a Korean facility, which in no way related to or was in competition with any recycling facilities in North America, including SDR. *See* Mot. Summ. J. on Non-Compete at 3-4; Ex. 10, Alverde Dep. at 179:15-181:2 (testifying that the "primary reason" justifying the 2014 Noncompete was "[t]o protect our assets in South Korea"). It had no effect on Robinson's "employment" with SDR. Doc. 136-1, Robinson Decl., ¶ 8; Ex. 10, Alverde Dep. at 180:15–23 (testifying that the advance of money owed under the prior transactions was "irrelevant" compared to the investment in GSDK).

Importantly, the agreements cannot be "harmonized" or read together without unintentionally eviscerating the effects of certain provisions. First, as stated above, the 2014 Noncompete is clear that is not an agreement for employment and that it survives even if Robinson is terminated by SDR. Ex. 11, ¶ 6. It is unclear how that express acknowledgment can be read in harmony with the underlying Employment Agreement. Second, and more importantly, Plaintiffs' position that the 2014 Noncompete modified the term "Covenant Period" in the Employment Agreement leads to absurd results. The 2014 Noncompete defines "Covenant Period" as "a period of seven (7) years following the Effective Date[.]" Ex. 11, ¶ 3. The Effective Date of that agreement is July 18, 2014. *Id.* ¶ 1. If Plaintiffs' position were correct, then the modification of the term

"Covenant Period" in the Employment Agreement would have effectively operated as a *release* of any claims based on acts that occurred during the original "Covenant Period" of the Employment Agreement. *Cf.* Ex. 8, EA, ¶ 10.2. There is nothing in the 2014 Noncompete indicating that the parties intended to release or nullify any claims. *Cf. Victora Bank & Tr. Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991) ("In order to effectively release a claim in Texas, the releasing instrument must 'mention the claim to be released."). When asked whether he intended to release Mr. Robinson from any obligations under the Employment Agreement when he entered into the 2014 Noncompete, Plaintiffs' President unambiguously testified: "No, I did not intend." Ex. 10, Alverde Dep. at 294:11–24.

The parties plainly did not intend for the 2014 Noncompete to incorporate and include the prior old provisions of the Employment Agreement. The 2014 Noncompete states only that it is modifying § 10.2 of the Employment Agreement, which is the "Non-Compete" provision. Ex. 11, ¶ 7(a). It is undisputed that the 2014 Noncompete nowhere mentions the word "non-solicit." *Compare* Ex. 8 and Ex. 11; *see also* Ex. 10, Alverde Dep. at 112:4–24. During negotiations of the 2014 Noncompete, the Nonsolicitation Clause, and its supposed incorporation into the 2014 Noncompete, was not mentioned. *Id.* at 114:21–115:7.

Accordingly, the overwhelming weight of the evidence reflects that the 2014 Noncompete and 2009 Employment Agreement arose from separate transactions, executed at separate times, for different purposes, and that the parties did *not* intend for these agreements to be read together, such that the Nonsolicitation was imported into the 2014 Noncompete. There is no way to read the agreements together to harmonize and give meaning to all their terms without doing damage to the intent of the parties. Under these circumstances, it is appropriate to read the document separately. *See Rieder*, 603 S.W.3d at 102.

To be clear, Defendants are not seeking a reconsideration of the Court's ruling dismissing Defendants' consideration-based defenses. *See* Doc. 166 at 8–9. Defendants read that order as holding that there was sufficient consideration for the 2014 Noncompete, which was ZI's investment in GSDK, such that the "ancillary to or part" of requirement of Texas Covenants Not to Compete Act was satisfied. *Id.* That determination did not hinge on the raised here—i.e., whether the Nonsolicitation clause was imported into the 2014 Noncompete by modification.

To the extent that the Court believes that reconsideration of the March 31, 2023 order is required to hold in Defendants' favor on this issue, Defendants respectfully move for reconsideration pursuant to Federal Rule 54(b). *See* Fed. R. Civ. P. 54(b) ("any order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Grand Famous Shipping Ltd. v. Port of Hou. Authority*, 572 F. Supp. 3d 307, 316-17 (S.D. Tex. 2021). Defendants do not simply "rehash" old arguments or raise new arguments with this request; Defendants cite to newly discovered evidence, including testimony from Plaintiffs' President that he did not intend for the 2014 Noncompete to release any claims related to the Employment Agreement and that the "primary reason" for the 2014 Noncompete was the Korea transaction. Defendants submit that there are at the very least fact issues that preclude summary judgment on whether the 2014 Noncompete modified and should be read with the Employment Agreement and that warrant reconsideration, if necessary.

**B.     The Nonsolicitation Clause Is Not Enforceable and Was Otherwise Not Breached.**

Even assuming the 2014 Noncompete modified and extended the 2009 Noncompete, thus including the Nonsolicitation Clause, the Nonsolicitation Clause is still a restraint on trade that must be reasonable. *See Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 438 (S.D.

Tex. 2008) ("To the extent that the nonsolicitation provisions constitute a separate covenant, such a nonsolicitation covenant is also a restraint on trade and competition and must meet the criteria of section 15.50 of the Texas Business and Commerce Code to be enforceable."). The nonsolicitation clause bars Robinson from soliciting SDR's "suppliers, distributors, licensees or other persons with whom [SDR] *has* a contractual relationship." Ex. 8, EA (emphasis added).

Based on the plain language of the clause, the prohibited suppliers are those who SDR had a contractual relationship with at the time of the Employment Agreement. *See Parrot-Ice Drink Prod. of Am., Ltd. v. K & G Stores, inc.*, 2010 WL 1236322, at *4 (Tex. App.—Houston [14th Dist.] Mar. 30, 2010) ("The clause is written in present tense, establishing that the relevant time period is the point in time at which the contract was signed."). That makes sense to reasonably prohibit Robinson from soliciting SDR's suppliers that he procured and whose contracts were purchased in the 2009 sale of SDR. *See Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387 (Tex. 1991) ("The fundamental legitimate business interest that may be protected by such covenants is in preventing employees or departing partners from using the business contacts and rapport *established* during the relationship of representing the accounting firm to take the firm's customers with him." (emphasis added)); *see also* Ex. 12, Corp. Rep. Dep. Dep. 70:19–73:17.

However, the inclusion of the Nonsolicitation Clause in the 2014 Noncompete then changes the scope of the solicitation clause. Specifically, if that clause's use of present tense is applied to the 2014 transaction, then it would include suppliers who Robinson did not procure, have a relationship with, or otherwise have any contact with on behalf of SDR. Ex. 9, Robinson Dep. at 23:24–24:12. In fact, there would be no way for Robinson to know who SDR had a contractual relationship with in 2014 given that he did not do anything for the business after 2009. *Id.* So to the extent that the supposed modification of the Employment Agreement is interpreted to

alter the time frame by which the suppliers in the Nonsolicitation Clause are defined, that nonsolicitation clause is overinclusive and requires reformation. *See Rimkus Consulting Grp., Inc.*, 255 F.R.D. at 440 (collecting cases and holding nonsolicitation clause was overbroad **because it included customers that the defendant had no contact with**); *TransPrefect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 756 (S.D. Tex. 2009) ("Section 15.51 **requires** a court to reform a non-compete agreement if it is unreasonably broad in scope." (emphasis added)).

Regardless of the enforceability of the Nonsolicitation Clause, there is no dispute that Robinson did not solicit any suppliers that SDR had a contractual relationship with in 2009. The MIPA lists the supplier agreements that SDR had at the time of the 2009 sale. *See supra* at 2.

Plaintiffs primarily assert that Robinson improperly solicited SDI, a "long-time customer of SDR[.]" Doc. 99, SAC, ¶ 104. However, at the time of the sale, in 2009, SDR had "absolutely not contractual relationship with Steel Dynamics." Ex. 10, Alverde Dep. at 110–11. It was not until *after* 2014 that SDI acquired the entity that controlled SeverCorr's facility in Columbus, Mississippi. Accordingly, Robinson and SDR had no pre-existing relationship with SDI prior to or at the time of the sale of SDR, and SDR did not have a "contractual relationship" with SDI for purposes of the Nonsolicitation Clause.

Moreover, there is no evidence or allegation that Defendants solicited SeverCorr or SDI in an effort to recycle dust **for the Columbus facility** after the sale of SDR.  Plaintiffs instead allege that Defendants violated the Nonsolicitation Clause in having discussions with **a separate entity**, Steel Dynamics Southwest, LLC (SDI Sinton), about recycling dust for **a new steel mill** in Sinton, Texas, that had not been constructed and was not producing dust. Ex. 9, Robinson Dep. at 139:14–21, 164:3–6. The evidence further shows that Plaintiffs has never had a contract with SDI Sinton. *See* Ex. 13, Septien Dep. at 94:16–95:23. Even if Plaintiffs serviced a separate SDI facility in

9

Columbus, MI, which was owned by a *different* entity, they had no connection with this new facility, and no prior relationship with the primary SDI Sinton representative responsible for commercial sales. *Id.* at 97:3–21, 135:19-136:7; Ex. 10, Alverde Dep. at 110:24–111:10; Ex. 14, PLAINTIFF0024914. As Plaintiffs have admitted, every steel mill has their own contracts and business dealings. Ex. 10, Alverde Dep. at 137:17-138:22 (████████████████████████ ████████████████; *Id.* at 168:4–169:8; 211:12–213:5; 220:1–8.

Finally, Plaintiffs' sworn testimony confirmed that █████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Ex. 10, Alverde Dep. at 140:5–16; Ex. 15. The evidence is clear that SDI Sinton was ████████████████████████ ████████████████████████████ Summary judgment is appropriate to the extent Plaintiffs assert that Robinson's dealings with SDI Sinton breached the Nonsolicitiation Clause.

Plaintiffs additionally allege that Robinson breached his Nonsolicitation Clause by soliciting Big River Steel, Commercial Metals Company, and Nucor. Plaintiffs' claims with respect to these "customers" are similarly defective—specifically, the record reflects that SDR did ***not*** have contractual relationships with these parties in 2009. It is also worth noting that Plaintiffs did not lose any of these customers. Plaintiffs managed to lock each of them up to long-term deals, despite any alleged solicitation from Defendants.

With respect to Big River Steel, that company did not exist in 2009 and so SDR did not, and could not, have had any contractual relationship with them. Ex. 16, Rowland Dep. 77:19–79:12. Plaintiffs next complain that Defendants breach the Nonsolicitation Clause by contacting Commercial Metals. In 2009, the only contractual relationship SDR had was with an affiliate of

Commercial Metals, SMI, in Alabama. *See supra* at 2. ███████████████████

████████████████████████████████████████ Ex. 17; Ex. 18. To the extent Plaintiffs

complain of solicitation related to these other plants, their claims are deficient. Likewise, Plaintiffs

allege that Defendants breached the Nonsolicitation Clause by reaching out to Nucor's facility in

Arkansas. Again, SDR did not have a contractual relationship with Nucor's facility in Arkansas in

2009. *See supra* at 2. Nor did it have a contractual relationship with Nucor other than the steel

mills located in Jackson, Jewett, Birmingham, Memphis, and Decatur. *Id.* In fact, the record shows

that as late as 2019 and 2020, ███████████████████████████████████████

██████████ Ex. 20; Ex. 19; Ex. 21 ███████████████████████████████████

███████████████████████████████. Ex. 22.

Because there is no dispute that Robinson did not solicit the suppliers with whom SDR ***had***

***a contractual relationship*** with at the time of the 2009 sale, Plaintiffs' breach of contract claim

based on the nonsolicitation clause fails.

**C.      Plaintiffs' Tortious Interference Claims Fail.**

Plaintiffs' tortious interference claims regarding both SDI Sinton (Claim J) and Big River

Steel, Nucor, "and other customers" (Claim K) fail because the undisputed record shows (1) it is

pure speculation that Plaintiffs would have obtained a contract with SDI Sinton but for Defendants'

actions, and (2) none of SDR's customers breached their contracts with SDR.

1.      *Summary Judgment is Proper on Plaintiffs' Claims for Tortious Interference with*
         *Prospective Contractual Relations—i.e., SDI Sinton.*

To prove tortious interference with prospective contractual relations, a plaintiff must show

that the defendant's conduct prevented a contractual relationship from forming. *See Enterprise*

*Crude GP LLC v. Sealy Partners, LLC*, 614 S.W.3d 283, 307 (Tex. App.—Houston [14th Dist.]

2020). The evidence shows that it is purely speculative that SDR would have signed a contract

with SDI Sinton to process dust but for Robinson's conduct. Summary judgment is thus appropriate. *See Tex. Disposal Sys. Landfill v. Waste Mgt. Holdings, Inc.*, 219 S.W.3d 563, 590 (Tex. App.—Austin 2007) (affirming summary judgment because plaintiff could not "prove its third element, that Waste Management's actions prevented the contracts from forming").

Based on the undisputed evidence, no reasonable factfinder could conclude that it was reasonably probable that Plaintiffs would have formed a contract with SDI Sinton. *See Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475–76 (Tex. App.—Houston [1st Dist.] 2006). As an initial matter, SDR had no prior relationship with SDI Sinton which was an entirely new steel mill that had not yet been constructed. Ex. 23, Montemayor Dep. 86:7–9; Ex. 10, Alverde Dep. 107:14–108:15, 110:24–111:10; Ex. 24 (███████████████████████████████

██████████; Ex. 14. SDI Sinton issued a ███████████████████████████████

████████. Ex. 24. SDI Sinton sought ███████████████████████████████████

███████ *Id.*

As part of this RFP process, █████████████████████████████████████████

█████████████████ Ex. 10, Alverde Dep. 141:15–142:25. ████████████████████

████████████████████████████████████████████████████████████████████████

█████████████ *Id.* at 144:9–151:8. The record reflects that Plaintiffs' claim that it would have won the SDI Sinton contract but for Defendants' acts is based on pure speculation. Plaintiffs' President testified that he ███████████████████████████████████

████████████████████████████████

---

███ Defendants also dispute liability on tortious interference based on the noncompetes because Zinc Nacional, the intended beneficiary of ███████████, was not a signatory to the noncompetes. Ex. 10, Alverde Dep. 141:10–14; 290:14 291:7).



*Id.* at 144:4–145:3; *see also id.* at 145:6–148:22. Finally, Plaintiffs made no efforts to determine whether they would have received the Sinton contract either before or after filing this lawsuit. *Id.* at 148:18-22. There is no evidence of what offer SDI Sinton may have accepted from Plaintiffs in a "but-for" world. *Id.* 144:9–151:8. Plaintiffs cannot establish a tortious interference with prospective contracts based on SDI Sinton. *Rimkus*, 688 F. Supp. at 676 ("Absent some evidence that the defendants' actions prevented [the plaintiff] from entering into a business relationship with clients who instead did business with the defendants, Rimkus cannot raise a fact issue as to its claim for tortious interference with prospective business relations."); *see also Richardson-Eagle, Inc.*, 213 S.W.3d at 475 (holding that a plaintiff must have evidence of more than just negotiations to establish tortious interference). The record shows that SDR/ZN offered proposals to SDI Sinton, along with two other bidders, and simply negotiated the terms of the proposals. This is insufficient to establish tortious interference with prospective contracts.

As a final matter, tortious interference with prospective contracts requires a showing that the defendant's conduct was "independently tortious conduct" that would be actionable under a

recognized tort. *Nix v. Major League Baseball*, 62 F.4th 20, 934 (5th Cir. 2023). To sustain an actionable claim, conduct must be more than "sharp" or "unfair." *Id.* (citation omitted). The undisputed record shows that Robinson merely submitted a proposal to SDI Sinton during the RFP process. Robinson and the SDI Sinton representative had a couple of exchanges to discuss the proposal and offer or change terms. This is not independently tortious conduct. Although Plaintiffs will argue that the conduct is in violation of the 2014 Noncompete, that allegation is based in **contract**, not tort. If the 2014 Noncompete is enforceable, breaching the noncompete is not conduct that is independently tortious. Bidding on a contract that was opened for bidding, is not conduct that can sustain a tortious interference with prospective contracts claim. *See Nix*, 62 F.4th at 935 (stating that "persuasion of others not to deal with plaintiff" is not independently tortious).

2.    *Summary Judgment is Proper on Plaintiffs' Tortious Interference with Existing Contracts—i.e., Big River Steel, Commercial Metals, and Nucor.*

To survive summary judgment on its claims for tortious interference with existing contracts, Plaintiffs must produce some evidence that Defendants induced a contracting counterparty of SDR to **breach** its contract. *See El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421-22 (Tex. 2017). Plaintiffs have generically alleged that Defendants have tortiously interfered with SDR's existing contracts with SDI, Nucor, BRS, and other customers. Doc. 199 at 45, ¶ 233. But the record undisputedly shows that none of SDR's steel mill suppliers has breached its contract with SDR as a result of Defendants. Ex. 10, Alverde Dep. 164:19-165:23, 194:24-195:10; Ex. 16, Rowland Dep. 103:3–19. In fact, Plaintiffs have successfully entered into new, long-term contracts with a variety of suppliers, including an astonishing contract to recycle dust for Nucor at all of its US-based facilities. Plaintiffs have adduced no evidence that any counterparty to a contract with SDR has breached its obligations to SDR. As a result, Plaintiffs' tortious interference with existing contracts claim fails as a matter of law. *See WickFire, L.L.C. v.*

14

*Laura Woodruff; TriMax Media, L.L.C.*, 989 F.3d 343, 356 (5th Cir. 2021), *as revised* (Mar. 2, 2021) ("Because there is no evidence TriMax's conduct in fact induced any entity to breach an agreement with WickFire, WickFire's tortious interference with contractual relations claim fails as a matter of law.").

**D.      Plaintiffs' Trade Secret Claims Fail as a Matter of Law.**

Because Plaintiffs' unfair competition, unjust enrichment, and tortious interference claims are based on the "taking of" and "use" of Plaintiffs' "confidential, competitively sensitive, proprietary and trade secret information" and "misappropriation," Doc. 99 at 51–53, those claims are preempted by Plaintiffs' TUTSA claims. The TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." *DHI Grp., Inc. v. Kent*, 397 F. Supp. 3d 904, 922 (S.D. Tex. 2019) (quoting Tex. Civ. Prac. & Rem. Code § 134A.007(a)). Plaintiffs' unfair competition claim is fundamentally concerned with the unauthorized taking and use of their confidential and proprietary information, most of which is described as the same information making up Plaintiffs' TUTSA claim. Doc. 99 at ¶¶ 266–69. Plaintiffs' unjust enrichment claim is based on the "use" of Plaintiffs' trade secret information. Doc. 99 at ¶ 275. Also, to some extent Plaintiffs' tortious interference claims are based on "Defendants utilize[ing] Plaintiffs' confidential and proprietary information to tortiously interfere with SDR's relationships." Doc. 99 at ¶¶ 225, 235. As a result, these claims are preempted by Plaintiffs' TUTSA claim. *See StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 337 (E.D. Tex. 2019) (concluding conversion, unfair competition, and tortious interference claims based on the use of trade secret information were preempted by TUTSA and granting summary judgment).

As for the elements of Plaintiffs' TUTSA and the Defend Trade Secrets Act (DTSA) claim,[2] Plaintiffs have failed to articulate exactly what its alleged trade secrets are nor have they produced evidence sufficient to establish trade secret status.[3] Plaintiffs have claimed that their customer supplier contracts contain confidential and proprietary information related to their trade secrets claim. Still, Plaintiffs have not produced any evidence to show how those contracts derive *independent* economic value. *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(6); 18 U.S.C. § 1839(3); *see also M-I LLC v. Q'Max Solutions, Inc.*, 2019 WL 3565104, at * n.22 (S.D. Tex. Aug. 6, 2019) (noting that the "DTSA's definition of 'trade secret' is functionally identical" to TUTSA's definition). "Information is valuable when it provides the competitor details about a product or service that give them a competitive advantage." *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 703 (W.D. Tex. 2019) (citation omitted). There is nothing in these contracts that gives Plaintiffs a competitive advantage. The mere existence of a contract is not an independently valuable trade secret. In fact, SDR is aware of steel mills having other contracts with others and steel mills typically inform recyclers when they are bound to a contract with another recycler. Ex. 10, Alverde Dep. 137:21–138:18; Ex. 30, PLAINTIFF0016318; Ex. 31, PLAINTIFF0024991; Ex. 32, PLAINTIFF0010033 (steel mill stating it ████████████████████████████ ██████████████████████████████████████████████████████████").) Moreover,

---

[2] Courts often address DTSA and TUTSA claims jointly under the same standard, when the claims are based on the same facts, because "a substantial number of the provisions in the two statutes— including the definition of 'trade secret'—are either identical or very similar in many respects." *DBG Group Investments, LLC v. Puradigm, LLC,* 2022 WL 313435, at *2 (N.D. Tex. Feb. 2, 2022).

[3] Plaintiffs represented that they are not bringing any trade secrets claims based "design-related" trade secrets concerning their steel mills. Ex. 25, Ltr. dated Aug. 15, 2023, 2. Plaintiffs have further represented that they will amend their discovery responses to reflect and identify what alleged trade secrets are at issue in this matter. However, as of the date of this filing, they have failed to do so.

the record shows that steel mills often open their steel dust to bidding and state the types of terms they prefer. Ex. 10, Alverde Dep. 157:6–14 (testifying ██████████████████████████ ████████████████████████████████████ Without evidence that the contracts themselves have independent value, or that the operation of a supplier contract is more than general knowledge, there is no genuine fact dispute that these contracts are trade secrets. *See Recif Resources, LLC v. Juniper Capital Advisors, L.P.*, 2020 WL 6748049, at *12–13 (S.D. Tex. Nov. 17, 2020) (granting summary judgment where there was no evidence that the alleged trade secret had any independent value); *Miner*, 383 F. Supp. 3d at 705–05 (noting matters of general knowledge in an industry are not trade secrets).

Regardless, the record is clear that Defendants have not used Plaintiffs' alleged trade secrets. An "essential element of a TUTSA violation is unauthorized ***use*** of the trade secret." *Recif Resources, LLC*, 2020 WL 6748049 at *13 (citing *Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d 346, 360 (Tex. App.—Houston [1st Dist.] 2018, no pet.) and *StoneCoat*, 426 F. Supp. 3d at 344). Plaintiffs' have produced their supplier contracts. Some of them contain different terms, pricing, and transportation costs. Generally, however, the terms of these contracts are pretty standard or boilerplate. (Ex. 10, Alverde Dep. 130:21–132:4.) This is in large part due to the fact that these contracts are a product of negotiations with steel mills. (*Id.*) To the extent Plaintiffs argue their pricing terms or tipping fee tables are trade secrets that are being used, that is clearly not the case where ████████████████████████████ █████████████████████████████. (*Compare* Ex. 26, PLAINTIFF0003904; Ex. 27, PLAINTIFF0005994–6003, *with* Ex. 28, ZR_0001337; Ex. 29, ZR_0009150–9153). And importantly, Defendants have not used any contracts in their operation of Zinc Resources or in negotiating with steel mills. *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 877 (5th Cir.

17

2013) (defining conduct that is "use" of a trade secret); *GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, 836 F.3d 477, 497 (5th Cir. 2016). The record shows that Robinson and Knepper have extensive know-how and general knowledge regarding commercial dealings with steel mills. Ex. 12, 30(b)(6) Dep. at 16:15–20:24; 108:24–111:14. And that is what they used with Zinc Resources. Defendants are entitled to summary judgment on Plaintiffs' TUTSA claim.

Finally, there is no evidence that Plaintiffs took reasonable measures to protect the information concerning customer contracts, particularly those that pre-dated the sale of SDR, as trade secret. *See* 18 U.S.C. § 1839(3); TEX. CIV. PRAC. & REM. § 134a.002(6); *INEOS Group Ltd. v. Chevron Phillips Chem. Co., LP*, 312 S.W.3d 843, 852 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (collecting Texas cases that hold that "the unrestricted disclosure of trade-secret information to third parties, outside the context of a confidential relationship, destroys the trade-secret status of the information"); *Numed, Inc. v. McNutt,* 724 S.W.2d 432, 435 (Tex. App.—Fort Worth 1987, no writ) (concluding that data was not trade secret because owner had previously disclosed it in contracts to its customers). Plaintiffs' corporate representative testified that Plaintiffs do not enter into confidentiality agreement with steel mills prior to negotiations. Ex. 12, 30(b)(6) Dep. at 236:11–23. And steel mills freely shared with Plaintiffs information regarding their existing contracts with other suppliers, including when those contracts were expiring. (Ex. 10, Alverde Dep. 137:21– 138:18; Ex. 30, PLAINTIFF0016318; Ex. 31, PLAINTIFF0024991; Ex. 32, PLAINTIFF0010033 (steel mill stating it ██████████████████████████████ ███████████████████████████████████████████████████████████

Moreover, the supplier contracts that Plaintiffs acquired pursuant to their purchase of SDR did not contain confidentiality provisions protecting the information in those contracts and that information was protected as confidential and trade secret prior to Plaintiffs' purchase of SDR. Ex.

30, 30(b)(6) Dep. at 15:4–16:12; Ex. 1, Robinson Decl. It was only *after* Plaintiffs acquired SDR that they started to include confidentiality provisions in finalized customer agreements and information concerning those agreements was not shared with Defendants. *Id.* at 235:9–236:10, 230:20–23; Ex. 10, Alverde Dep. at 61:2–63:4; Ex. 9, Robinson Dep. at 23:22–24:12. Accordingly, summary judgment is proper because Plaintiffs have failed to keep their contracts and information relating to their contracts secret.

**E.    Because the Underlying Tortious Interference Claims fail, the Civil Conspiracy Claims Likewise Fail.**

Conspiracy is a derivative tort, and a defendant's liability for conspiracy depends on participation in some underlying tort." *Id.* (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). "Where the underlying tort claim fails, so too does the conspiracy claim." *Id.* (citation omitted). Plaintiffs' civil conspiracy claims in Claims P and Q are based on an alleged conspiracy that sought to tortiously interfere with Plaintiffs' contracts with customers and prospective customers, i.e., SDI Sinton. (Doc. 99 ¶ 298, Claim R.) As discussed above, Plaintiffs' tortious interference claims related to existing contracts and prospective contracts fail. Because the underlying torts for tortious interference fail, so do Plaintiffs' civil conspiracy claims.

## CONCLUSION

For the foregoing reasons, Defendants respectfully ask the Court to grant summary judgment in their favor on Plaintiffs' breach of contract claim based on solicitation (Claim A), tortious interference claims (Claims J & K), trade secret claims (Claims L &M), and conspiracy claims.

Respectfully submitted,

**REYNOLDS FRIZZELL LLP**

By: <u>/s/ *Jean C. Frizzell*</u>
    Jean C. Frizzell
    State Bar No. 07484650
    Zach Burford
    State Bar No. 24109673
    Thallia Malespin
    State Bar No. 24120643
    1100 Louisiana, Suite 3500
    Houston, Texas 77002
    Telephone: (713) 485-7200
    Facsimile: (713) 485-7250
    jfrizzell@reynoldsfrizzell.com
    zburford@reynoldsfrizzell.com
    tmalespin@reynoldsfrizzell.com

    **ATTORNEYS FOR DEFENDANTS/
    COUNTER-PLAINTIFFS RUSS
    ROBINSON AND ZINC RESOURCES,
    LLC, AND DEFENDANTS ZINC
    RESOURCES HOLDING, LLC, U.S.
    GLOBAL STEEL DUST, INC., US SDR,
    LLC, THOMAS KNEPPER, AND
    ROBERT SHERRY**

## **CERTIFICATE OF SERVICE**

I hereby certify that in accordance with the Federal Rules of Civil Procedure, a true and correct copy of the foregoing was served upon the following counsel of record on this the 8th day of September, 2023.

Christina Ponig Maccio
León Cosgrove Jiménez, LLP
Houston, Texas
cmaccio@leoncosgrove.com

Paul J. Stancil
Orrick, Herrington & Sutcliffe LLP
609 Main Street, 40th Floor
Houston, Texas 77002
pstancil@orrick.com

Jay Jurata
Dechert LLP
1900 K Street, N.W.
Washington, DC 20006
jay.jurata@dechert.com

/s/ *Thallia Malespin*
Thallia Malespin